**Opinion issued April 28, 2026**



**In The**

# Court of Appeals

**For The**

# First District of Texas

———————————

**NO. 01-25-00917-CV**

———————————

**IN THE INTEREST OF D.D.D.-H. A/K/A D.D.D.H., A.R.M., AND O.N.H. A/K/A O.H., CHILDREN**

---

**On Appeal from the 313th District Court**
**Harris County, Texas**
**Trial Court Case No. 2021-01301J**

---

**MEMORANDUM OPINION**

In 2023, the trial court appointed the Department of Family and Protective

Services as sole managing conservator of minor children D.D.D.-H. *a/k/a* D.D.D.H.

(Daniel), A.R.M. (Alex), and O.N.H. *a/k/a* O.H. (Oscar).[1] The court allowed Alex and Oscar to continue living with N.M.H.H. (Mother), but Daniel was in a foster placement, and the court allowed Mother only limited visitation with Daniel.

More than a year later, the Department moved for modification of conservatorship and sought termination of Mother's parental rights to the children. Following trial, the trial court granted the Department's motion to modify and found that Mother violated three statutory predicate grounds for termination and that termination of her parental rights was in the children's best interest.

On appeal, Mother challenges the legal and factual sufficiency of the evidence to support the trial court's findings that (1) termination was warranted under Family Code sections 161.001(b)(1)(D) and (E), (2) termination was warranted under former subsection (O),[2] and (3) termination of Mother's parental rights was in the children's best interest. We affirm.

---

[1] In this opinion, we use pseudonyms for the minor children and their family members to protect their privacy. *See* TEX. R. APP. P. 9.8(b)(2).

[2] At the time the Department moved to modify the conservatorship order and at the time of trial in August 2025, subsection (O) provided that a court could terminate a parent's rights if it found by clear and convincing evidence that the parent "failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of [the Department] for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child." *See* Act of May 24, 2005, 79th Leg., R.S., ch. 508, § 2, sec. 161.001(b)(1), 2005 Tex. Gen. Laws 1395, 1396 (amended 2025). In the 2025 legislative session, the Texas Legislature removed this provision as a predicate ground that can support termination of a parent's rights and renamed the

2

## Background

Mother has three minor sons: Daniel, who was born in 2011; Alex, who was born in 2019; and Oscar, who was born in 2021. At the time of trial in August 2025, Daniel was fourteen, Alex was six, and Oscar had just turned four.

### A. The Department First Becomes Involved with the Family

In August 2021, days after Oscar's birth, the Department received a referral that Mother had physically abused ten-year-old Daniel. Mother allegedly contacted law enforcement and reported that Daniel had run away from home. Mother "indicated she wanted police to 'hurry up' because she was going to sleep." When police officers arrived, she was not worried about Daniel and stated that she did not care what happened to him. Mother told officers that Daniel ran away "because she told him to clean, and he got angry." She told a Department investigator that Daniel watched and drew "inappropriate 'stuff,'" he broke Alex's tablet, he frequently lied,

---

remaining predicate grounds. *See* Act of May 14, 2025, 89th Leg., R.S., ch. 211, H.B. 116, § 2 (to be codified as an amendment to TEX. FAM. CODE § 161.001(b)(1)). This amendment became effective on September 1, 2025, and "applies to a suit affecting the parent-child relationship that is pending in a trial court on the effective date of this Act or that is filed on or after the effective date of this Act." *See id.* §§ 3–4.

The trial court did not sign the decree terminating Mother's parental rights until October 14, 2025, but when it did so, one of the three predicate grounds it listed in the decree was former subsection (O). That predicate ground was no longer a valid ground for terminating Mother's parental rights. We therefore do not address the merits of Mother's second issue, as former subsection (O) cannot support the termination decree.

and he "typically acts up with her when she has [male] company." She stated that "she would abandon him because of the way he acts up."

Daniel returned to the house while officers were still speaking with Mother. He stated that one of his younger siblings broke a table, but Mother blamed Daniel "and then used [a] stick to hit his arm four times," leaving his forearm swollen. Daniel wanted to stay living in his home, but he was afraid that Mother would hit him. He reported that Mother previously had hit his back with an extension cord. The Department was concerned that Mother was "using substantial or unreasonable use of physical force on the children."

Police officers arrested Mother for injury to a child. Because Mother was in custody and did not provide the names of any family members who could care for the children, the Department sought temporary managing conservatorship. The charges against Mother were later dropped. Alex and Oscar were allowed to remain in the home with Mother, but Daniel was placed in foster care.

The Department created a family plan of service for Mother. Daniel was in a psychiatric hospital at the time the Department created the plan, and the Department noted that it had "some concerns regarding [Daniel's] emotional and behavioral health." The Department was worried that if Mother "continues to discipline [Daniel] in the manner which has been alleged, leaving bruises on his body[,] that this could result in him being physically harmed in a way that could be detrimental

to his health." Among other things, the service plan required Mother to maintain stable housing and employment, complete parenting classes, complete a drug/alcohol assessment and follow all treatment recommendations, and complete a psychosocial assessment and follow all recommendations (including individual or group counseling, if necessary).

## B.    The January 2023 Conservatorship Order

Following a trial that occurred in December 2022,[3] the trial court signed a decree relating to the children's conservatorship in January 2023. The court determined that naming Mother as the children's managing conservator would not be in the children's best interest. It instead appointed the Department as the children's sole managing conservator. But it did not terminate Mother's parental rights to the children. Although the court deferred determination of the children's possessory conservator, it allowed Mother to have visitation with Daniel "as mutually agreed with the [D]epartment," and it allowed Alex and Oscar to remain in Mother's home.

The Department created a new service plan for Mother around the time of the conservatorship order.[4] The plan noted that all three children were physically healthy

---

[3]     The appellate record does not contain a transcript of the December 2022 trial proceedings.

[4]     The Department noted that Mother had completed some of the tasks from her original service plan, including parenting classes, a substance abuse assessment

and developmentally on target, and Daniel, the only school-aged child, was "on target with his education." Both Daniel and Alex were "receiving services for [their] behavior concerns," and Daniel's behavior concerns included "a history of delinquent behavior." The placements for all children—residential treatment for Daniel and Mother's home for Alex and Oscar—were meeting their needs.

The new service plan also stated that Mother "has been working on ways to extend her knowledge and skills for her parenting" and "has been actively working on preventing intimate partner violence." Nevertheless, the Department remained concerned that Mother's method of disciplining Daniel might cause him harm. The Department wanted Mother to work with it and "service providers to assess and address parenting skills," and it also wanted her to "progressively work on her relationship with [Daniel] and develop a support system and safety network for herself and her children." The Department was also concerned that Mother "does not have stable employment and has been evicted due to non payment" of rent.

## C. The Department Moves for Modification and Seeks Termination of Mother's Parental Rights

Following the January 2023 order, the trial court continued holding placement review permanency hearings. The Department's primary goal remained reuniting Daniel with Mother and his younger brothers, but the Department also identified

_____

(which had no recommendations), a psychosocial assessment, and a psychiatric evaluation.

relative adoption as a goal if Mother's parental rights were terminated and a relative would be willing to adopt Daniel.

In January 2024, the Department evaluated the children's needs and Mother's progress with her service plan. Daniel was physically healthy and developmentally on target, and he was "getting the assistance he needs" concerning his education. He "has occasional difficulty dealing with situational stress, crises, or problems," and he "experiences stressful interactions with family members" that interfere with his "sense of safety and security." Although he has "some conflicts," he "experiences positive interactions with placement family/staff members and feels safe and secure in the family or placement setting." The evaluation noted that Alex also "experiences stressful interactions with family members" that interfere with his "sense of safety and security."

In addition to restating the previous concern about Mother's use of physical discipline, the Department identified several new concerns. Specifically, the Department was worried that Mother "lacks judgment and parenting skills due to alleged mental health and instability"; "will continue to leave the children in [an] unsafe environment"; and "will not provide the basic necessities such as safe and crime free shelter, food, clothing, medical care, and basic supervision for the children."

The evaluation noted that Mother, Alex, and Oscar were currently residing in a shelter. Mother "severely mismanages available resources, which results in unmet basic care needs of housing, food and clothing" for the children. Although Mother completed her parenting classes more than a year before the evaluation, she "needs improvement of basic parenting skills." Mother had no social support system and "does not use extended family and community resources." Mother participated in random drug testing in January 2024 and "may have a history of substance abuse or may currently use alcohol or drugs." Mother "demonstrates periodic mental health symptoms, including but not limited to symptoms of depression, low self-esteem or apathy," and she "disclosed a history of bipolar disorder and does not take any medication." Mother also "has occasional difficulty coping with situational stress, crises, or problems."

Around this same time, the Department removed Alex and Oscar from Mother's home and placed them in foster care. Daniel remained in a residential treatment center, although he moved into foster care in May 2024.

In June 2024, the Department moved to modify the January 2023 conservatorship order, alleging that the circumstances of the children or Mother had materially and substantially changed. In an amended motion to modify, the Department specified that it now sought termination of Mother's parental rights to

the children.[5] The court ordered Mother to submit to drug testing, and it also suspended visits between Mother and the children, although visits with Daniel could occur at his request.

## D. The Trial Proceedings

The trial court held a bench trial in August 2025. Department caseworker Davien Guidry testified about the 2021 referral that led to Daniel's removal from Mother's care and this proceeding. Initially, the Department was concerned about the potential for physical abuse of all three children, stability of the home environment, and Mother's temper.[6] The Department also became concerned about Mother's mental health, drug use, and how she interacts with all three children.

---

[5] The Department also sought termination of the parental rights of the children's fathers. Although represented by counsel, none of the fathers participated at trial. The trial court terminated the parental rights of each father. The fathers are not parties to this appeal.

[6] Mother, Daniel, and Alex all lived in Michigan before moving to Texas at some point before Oscar's birth. The trial court admitted a record of Mother's CPS history from Michigan. This exhibit describes several allegations of neglect or physical abuse involving Mother and Daniel, including allegations that Mother hit Daniel with a belt after he misbehaved or got in trouble at school. In both instances, Michigan CPS determined that the allegations were not supported by a preponderance of the evidence. In 2019, Mother's boyfriend—Alex's father— allegedly hit Mother and, in the midst of the altercation, also hit Daniel. During the ensuing investigation, both Mother and Daniel reported that Alex's father had been violent before. The investigator concluded that Daniel was "at risk of being hit during [the] domestic altercation" and that both Daniel and infant Alex "were in an immediate risk of harm."

9

The Department typically wants to see a parent maintain a stable home for six months, but Mother had not been able to live in a home for six consecutive months. Guidry did not know Mother's current living arrangements. Mother had been evicted at some point before the trial setting, and Guidry asked where Mother was living, but Mother was not forthcoming with information. Mother had been evicted from several apartments and at least one hotel room, and each time she was evicted for nonpayment of rent.

Child Advocates volunteer Holly Meier, the children's guardian ad litem, "observed food insecurity" with Mother and the younger children. Meier would sometimes bring food with her when she visited Mother, and "[e]ven a week's worth of food was quickly ingested while [Meier] was there." Mother refused to go to food banks for assistance. The children had not been diagnosed as malnourished, but Alex "needed a lot of dental work which may speak to the quality of food that he was getting." Meier also agreed with the children's ad litem attorney that the first time she visited Mother at home, the apartment was unclean and "chaotic." Alex and Oscar had "no structure" in the home, and Meier described the home as "disruptive," "messy," and "unorderly."

Mother had been employed "[o]n and off" during the case. Mother did not consistently provide proof of employment to Guidry. On one occasion, Mother provided two check stubs to Guidry, who verified the employment, but Mother then

left that job. In May 2025, Mother informed Guidry that she was working in a sales position, but although Mother provided the name of the company to Guidry, she never provided any contact information or check stubs, and Guidry could not verify that employment. Mother's last verified job was more than six months before trial.

Mother completed a psychological assessment. That assessment reflected that she had been diagnosed with PTSD due to being physically and sexually abused as a child. Mother also self-reported that she had been diagnosed with bipolar disorder. Mother did not receive treatment for these disorders through either medication or therapy. Her psychosocial assessment recommended that she complete individual therapy, but she was discharged for missing appointments.

Mother had several positive drug tests throughout the case.[7] Near the beginning of the case, in October and November 2021, her hair sample tested positive for marijuana. Her hair sample also tested positive for marijuana in January 2024. In February 2024, March 2024, and May 2025, her urine sample tested positive for codeine and morphine. And in April 2024, December 2024, and January 2025, she tested positive for codeine. Mother denied using drugs.

Daniel had been in either foster care or residential treatment since his removal from Mother's care in August 2021. The Department initially allowed Alex and

---

[7]     Mother's Michigan CPS history reflects that she tested positive for marijuana use in 2014 and that she and Alex's father had attempted to buy marijuana before the 2019 incident in which Alex's father hit Mother and Daniel.

Oscar to remain with Mother, but they were placed in foster care in January 2024 after Mother allegedly punched Alex in the face, resulting in a black eye. Meier believed that this incident created concern that Mother was "no longer being able to provide a safe home for the younger two boys." Child Advocates had been working toward Daniel returning home, but after the injury to Alex, the goal shifted away from reunification.[8]

Mother's temper remained a concern throughout the case. Guidry saw Mother become "irate and upset" with the children's foster parents. She "personally received calls from [Mother] with inappropriate language, tones, [and] emails." Previous caseworkers documented similar behavior from Mother.[9] Mother also had altercations with staff members at Alex and Oscar's daycare, which led to their discharge from that daycare. That concerned the Department because both children were receiving "therapy skills training" at daycare, and without consistent attendance, their progress would slow or stop. Moreover, the daycare generally was a source of stability for Alex and Oscar.

---

[8] When asked why the original goal was reunification, Meier testified that Mother had "the desire to have her children back but yet, at that same time, there was the [inability] to take accountability of the actions that led up to this. [Mother] was never able to acknowledge that she was the cause for [Daniel] being removed from the home."

[9] Meier believed that Mother was a "caring mother" who had issues with anger, housing instability, and related job insecurity. She testified that Mother had verbally abused her, and the verbal abuse was usually related to Mother's service plan or Child Advocates' failure to assist in obtaining stable housing.

Mother and Daniel participated in family therapy together. Mother expressed her anger over the court proceedings to Daniel, blaming him for the Department's involvement. She also blamed him for Alex and Oscar's removal, stating that was because "he refused to come home and she still had an open CPS case." She accused him of being jealous of his younger siblings and their relationship with her. In response, Daniel would get upset, cry, or "completely disconnect." He stopped wanting to attend therapy sessions, and he "never felt comfortable reengaging in the family therapy with Mom." Mother behaved similarly during family visits with Daniel. Daniel would sometimes leave visits early due to Mother's behavior, and he started feeling uneasy or unsettled in the days leading up to visits. Switching to phone visits with Mother did not help because Mother would yell at Daniel for not wanting to see her. Daniel's emotional state had improved considerably since stopping visits with Mother.

Mother had difficulty redirecting Alex during visits. During one visit at McDonald's, Alex kept throwing a ball at other people. Mother grabbed and pulled Alex to their table, and he "decided to kick and scream and pull Mom's hair." Mother seemed overwhelmed and like she did not know what to do. Alex started having bad anxiety before and after visits with Mother, and his anxiety manifested as "a lot of fidgeting," becoming easily agitated and frustrated, and biting his fingernails until they bled. He had trouble sleeping, sometimes waking up around fifteen times per

night, and he "had a big fear of being returned or having to go back was his words." His anxiety and sleeping difficulties reached the point that his foster parents had to sleep outside of his bedroom. Alex's last visit with Mother was in January 2025, and the court suspended further visits. Since that suspension, Alex's anxiety had decreased, he needed less medication, his foster parents were no longer sleeping outside his room, and his emotional stability had improved.

Daniel has been diagnosed with disruptive mood disorder and ADHD. He was angry and hurt at the beginning of the case, and he did not know how to deal with his emotions.[10] He had several psychiatric hospitalizations and placements in residential treatment centers relating to his anger and threats of self-harm. He ran away from residential treatment centers on several occasions.

Since May 2024, Daniel had been in a foster placement with the sister of a staff member at one of the residential treatment centers. Daniel's foster mother became acquainted with Daniel when she volunteered to take center residents on field trips or weekend outings. She described Daniel as "broken, sad, [and] carrying a little anger from his past" when he first began living in her home. Daniel had made

---

[10]     Meier testified that Mother told her that before Daniel was removed from her care, boyfriends would come to her house and "cause disruption" to Daniel "in the sense of either there would be reprimanding from these men of [Daniel's] behavior or the behavior that was being observed was inappropriate for a boy that age to have observed in terms of sexual touching." The record contains no indication that Daniel was ever sexually abused.

substantial progress in that placement: he enjoyed going to school, his grades had improved, he had not had behavioral issues at school, he was involved in athletics, he made friends, he actively engaged in therapy, and his medication had decreased. Daniel's therapist believed he had made "tremendous progress," and she recommended that he remain in his current placement. Meier testified that Daniel had calmed down and learned to control his emotions: "He's really showing that he's thriving in a stable environment." Daniel's foster mother agreed and believed that Daniel was now "[j]ust a total different kid, just a great kid all the way around."

Guidry and Meier spoke with fourteen-year-old Daniel about his preferred outcome for the case. Daniel wanted to stay in his current placement, and he wanted Mother's parental rights to be terminated. He told Guidry that he was afraid of experiencing physical and mental abuse if he were returned to Mother. Daniel's foster home was an adoptive placement, and his foster mother intended to adopt him. Daniel had not recently mentioned Mother, and he never expressed any desire to talk to her.

Alex had been in foster care with Oscar for approximately eighteen months, and he had also "progressed very well." His speech had improved, he no longer hoarded food, he did chores around the house without being asked, and he reacted much better to being corrected by an authority figure. Guidry believed the stability and structure of the foster placement had "been a good thing for him," and Alex's

foster mother agreed that he "thrives with structure and routine." Alex made progress in therapy, and because his anxiety had decreased, he did not need as frequent visits with the therapist. Alex was involved with sports, he was doing well in school, and he was excited that Oscar now attended his school "so he's a big brother at school now." This foster home was also an adoptive placement, and Alex and Oscar's foster parents intended to adopt them.

When Oscar first went into foster care, he was underweight and "very small for his size."[11] He was not potty-trained, which was not unexpected for a two-year-old, but he would not indicate to his foster mother or to daycare workers that his diaper needed changing: "he would just silently wear it." He did not speak much at all. By the time of trial, Oscar "never stop[ped] talking" and was "always a joyful little boy and always running around." Oscar was very excited about starting school.

Despite being in two different foster placements, the children saw each other frequently. Oscar had a birthday right before the trial setting, and he had a party that Daniel attended. The children's foster parents "have been great in incorporating each other in each other's lives so the kids could have those sibling visits." The children had a strong sibling bond, and the Department was not worried about that changing

---

[11] When Oscar was attending visits with Mother, she would bring junk food, which would give him stomachaches and lead to doctor's appointments. Mother did this despite being told not to. He would also become fussy and agitated around the time of visits, and he experienced vomiting, a lack of appetite, and increased bed-wetting.

if the court terminated Mother's parental rights. Alex and Oscar's foster mother testified that she and Daniel's foster mother were "constantly looking for new things for the kids to do."

Mother testified and explained why her parental rights should not be terminated:

> [Y]ou do for your kids and put yourself last, even for [Daniel] when he was having his behavior issues. I wasn't trying to tear him down. I was being a caring mother. What's wrong? What's bothering you? Talk to me about what's going on, getting him into therapy because he didn't want to open up to me. I don't discipline them the way that they're saying. I don't beat my kid. I never whooped him with a belt. Was there some things that I needed to change as far as how I speak to him? Probably so. Because that's a form of verbal abuse is how I say things to him that probably triggered him, but I never physically abused my kids. So, I feel like I deserve—they are part of me. And to have—to be able to be there through their development, I don't want to miss out on none of them.

Mother wanted her sons to be happy and stable, she wanted them to have structure, and she wanted to raise them "to be successful young men in society." She requested that the trial court give her another chance with her children.

Following trial, the trial court signed an order modifying the January 2023 conservatorship order. The court found by clear and convincing evidence that Mother violated three predicate grounds for termination and that termination of her parental rights was in the children's best interest. The court appointed the Department as the children's sole managing conservator. Mother appeals.

17

## Sufficiency of Evidence

On appeal, Mother challenges the sufficiency of the evidence supporting the trial court's findings. In her first issue, she argues that legally and factually insufficient evidence supports the trial court's endangerment findings under subsections (D) and (E). In her third issue, Mother argues that legally and factually insufficient evidence supports the trial court's finding that termination of her parental rights is in the children's best interest.

### A. Standard of Review

To terminate a parent's rights to her minor children, the factfinder must find by clear and convincing evidence that (1) at least one statutory predicate ground for termination exists, and (2) termination of parental rights is in the children's best interest. *In re C.E.*, 687 S.W.3d 304, 308 (Tex. 2024) (per curiam). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE § 101.007.

When conducting a legal sufficiency review of termination findings, we consider all the evidence in the light most favorable to the finding to determine whether a reasonable factfinder could have formed a firm belief or conviction about the truth of the Department's allegations. *In re R.R.A.*, 687 S.W.3d 269, 276 (Tex. 2024); *In re C.E.*, 687 S.W.3d at 308 (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex.

2002)). Although the "high evidentiary burden" mandated at trial requires a "heightened standard of review" on appeal, we must still defer to the factfinder who heard the witnesses and evaluated their credibility. *In re J.F.-G.*, 627 S.W.3d 304, 311–12 (Tex. 2021) (quotation omitted). The factfinder resolves conflicts in the testimony, weighs evidence, and draws reasonable inferences from the evidence that it chooses to believe. *In re C.E.*, 687 S.W.3d at 308–09. We must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, but we should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. *Id.* at 308. We may not substitute our judgment for that of the factfinder. *Id.* at 309.

When reviewing the termination findings for factual sufficiency, we weigh disputed evidence contrary to the finding against all evidence favoring the finding. *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). We must determine whether the disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding. *Id.* Evidence is factually insufficient if, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true. *Id.*

Only one statutory predicate ground and a best interest finding are necessary to support a judgment for termination of parental rights. *In re M.P.*, 639 S.W.3d 700,

19

702 (Tex. 2022) (per curiam). But termination based on subsections (D) or (E) can form the basis to terminate a parent's rights to another child. TEX. FAM. CODE § 161.001(b)(1)(M); *In re N.G.*, 577 S.W.3d 230, 234 (Tex. 2019) (per curiam). Even if sufficient evidence supports another predicate ground, we must review a finding under subsections (D) or (E) when challenged by a parent. *In re N.G.*, 577 S.W.3d at 235 (stating that appellate court's failure to review challenged subsection (D) or (E) finding "deprives the parent of a meaningful appeal and eliminates the parent's only chance for review of a finding that will be binding as to parental rights to other children").

## B.    Endangerment Findings

The trial court may order termination of a parent's rights under subsection (D) if the court finds by clear and convincing evidence that the parent knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child. TEX. FAM. CODE § 161.001(b)(1)(D). Under a related provision, the court may terminate a parent's rights under subsection (E) if the court finds by clear and convincing evidence that the parent engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child. *Id.* § 161.001(b)(1)(E).

As used in these subsections, "endanger" means to expose a child to loss or injury or to jeopardize the child. *In re R.R.A.*, 687 S.W.3d at 277. The endangering conduct does not have to be directed at the child, nor must the child actually suffer injury. *Id.* The factfinder may infer endangerment from a course of conduct that presents substantial risks to the child's well-being. *Id.* These risks "can be developed by circumstances arising from and surrounding a parent's behavior," but the risks "must be more than 'a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment.'" *Id.* (quoting *Tex. Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). "Conduct that subjects a child to [a] life of uncertainty and instability endangers the child's physical and emotional well-being." *Jordan v. Dossey*, 325 S.W.3d 700, 723 (Tex. App.—Houston [1st Dist.] 2010, pet. denied).

Subsection (D) focuses on the child's environment. *In re J.W.*, 645 S.W.3d 726, 749 (Tex. 2022). Relevant considerations include the suitability of the child's living conditions and the conduct of the parent or others in the home. *Id.* "Inappropriate, abusive, or unlawful conduct by a parent or other persons who live in the children's home can create an environment that endangers the physical and emotional well-being of children as required for termination under subsection (D)." *In re R.R.*, 711 S.W.3d 126, 139 (Tex. App.—Houston [1st Dist.] 2024, no pet.). Typically, the relevant time frame for evaluating subsection (D) is before the child's

removal from the home. *In re J.W.*, 645 S.W.3d at 749 & n.12. A single act or omission may support termination under this subsection. *In re R.R.*, 711 S.W.3d at 139.

Subsection (E), on the other hand, requires more than a single act or omission; instead, this subsection requires a voluntary, deliberate, and conscious course of conduct by the parent. *Id.* We may consider the parent's actions before the child's birth "while the parent had custody of older children." *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009). We may also consider conduct that occurred after the Department removed the child from the parent's care. *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). Because subsection (D) and subsection (E) "both concern endangerment and the evidence on each may overlap in some respects," we will address both predicate grounds together. *In re R.R.*, 711 S.W.3d at 140 (quoting *In re S.R.*, 452 S.W.3d at 359–60).

In arguing that legally and factually insufficient evidence supported the trial court's (D) and (E) findings, Mother focuses on three things: (1) her "chronic housing and economic insecurities"; (2) the way she spoke to Daniel, which she acknowledged at trial was a "form of verbal abuse" that "probably triggered him"; and (3) her reluctance to seek assistance from food banks, which "may indicate a lack of insight into her mental health issues." The trial record, however, contains additional evidence that supports the trial court's endangerment findings.

22

Specifically, the Department presented evidence that Mother physically abused Daniel and Alex. This behavior led to the removal of all children from Mother's home.

The Department first became involved with the family following a referral alleging physical abuse of Daniel.[12] Mother called the police and reported that ten-year-old Daniel had run away. She did not seem concerned about his whereabouts. When he returned to the house, Daniel told officers that Mother blamed him for a broken table and hit his arm several times, leaving his arm swollen. This was not the first time that Mother had hit Daniel: she had previously used an extension cord to hit him on his back. Daniel wanted to return home, but he was afraid that Mother would hit him again. He later told a caseworker that he wanted to remain in his foster placement, and he wanted the court to terminate Mother's parental rights because he was "afraid of going back and being physically abused and he's even stated mentally abused."

The Department's concern that Mother would discipline the children in a way that led to physical harm persisted throughout the case. Although Daniel was removed from Mother's care in August 2021, Alex and Oscar continued living with Mother until January 2024, when Mother hit four-year-old Alex in the face, leaving

---

[12]  Mother denied hitting Daniel. As the factfinder in this bench trial, the trial court evaluated Mother's credibility and could have disbelieved her testimony on this point. *See In re C.E.*, 687 S.W.3d 304, 308–09 (Tex. 2024) (per curiam).

bruises by his eye. Abusive or violent conduct by a parent can create a home environment that endangers a child's well-being. *See In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.); *see also In re R.R.*, 711 S.W.3d at 139 (stating that inappropriate or abusive conduct by parent in home "can create an environment that endangers the physical and emotional well-being of children" under subsection (D)).

Mother's behavior could be volatile. She sometimes yelled during visits with Daniel. She was "irate and upset" with the children's foster parents. She made calls and sent emails to Guidry, other caseworkers, and Meier that contained inappropriate language. And she was involved in an altercation with employees at Alex and Oscar's daycare, leading to their discharge from that program. This concerned the Department because Alex and Oscar received therapy at the daycare, and the daycare was one of their only sources of stability.

Mother also spoke harshly to Daniel during visits and family therapy sessions. Daniel became upset, and he eventually requested to stop in-person visits with Mother. When they switched to phone visits, Mother behaved similarly, and Daniel stopped wanting to participate in those visits as well. Visits with Mother caused anxiety and emotional unrest for all three children. Their behavior improved after the trial court suspended visitation. At trial, Mother recognized that the way she had communicated with Daniel was "a form of verbal abuse."

24

Although she denied being physically abusive toward the children in her trial testimony, in the section of her appellate brief addressing best interest, Mother's counsel candidly acknowledged that she was physically and emotionally abusive to Daniel and that this behavior was not justified. Counsel also acknowledged that Mother's "behaviors led to the removal of the younger two children," Alex and Oscar. Counsel admitted that Mother "had not meaningfully addressed her behaviors through services nor had she acknowledged her behaviors as being the cause of the children's removal."

Furthermore, as Mother herself recognizes, she experienced housing and employment instability throughout the case.[13] *See In re M.N.G.*, 147 S.W.3d 521, 538–39 (Tex. App.—Fort Worth 2004, pet. denied) (op. on reh'g) (considering, among other evidence, mother's difficulty maintaining stable home and inability to remain employed "for longer than a few months"). She lived in at least six different places during the case, and she never stayed in any place for six months, a benchmark that the Department used for housing stability. Mother was repeatedly evicted for nonpayment of rent. Meier described Mother's home as chaotic, messy, unclean, and disorderly. Mother, Alex, and Oscar all displayed concerning behavior relating to

---

[13]    None of this is to say that poverty furnishes a basis for termination. To the contrary: "Poverty is not a basis for termination, but a parent's failure to provide a stable home and otherwise provide for a child's needs may contribute to a finding that termination is appropriate." *In re I.H.*, No. 02-25-00524-CV, 2026 WL 253453, at *7 (Tex. App.—Fort Worth Jan. 30, 2026, pet. filed) (mem. op.).

food, including eating a week's worth of food in one sitting and food hoarding by the children. The children stopped hoarding food after their removal from Mother's care. Mother did not seek out assistance from food banks.

Mother was diagnosed with PTSD, and she self-reported a bipolar diagnosis, but she did not take any medication or participate in therapy to treat these disorders. Mother did engage in some individual counseling, but the therapist discharged her due to missing appointments. *See Jordan*, 325 S.W.3d at 726 (considering mother's mental health history, "her minimization of her present mental condition," and her "present failure to strictly comply with her medication and therapy").

Mother's "inappropriate" and "abusive" conduct directed toward Daniel and Alex created an environment that endangered the physical and emotional well-being of the children, supporting termination under subsection (D). *See In re R.R.*, 711 S.W.3d at 139; *In re J.I.T.P.*, 99 S.W.3d at 845. That same conduct was part of a voluntary, deliberate, and conscious course of conduct that endangered the children's physical and emotional well-being, supporting termination under subsection (E). *See In re R.R.*, 711 S.W.3d at 139.

When considering the evidence before the trial court in the light most favorable to the (D) and (E) findings, we conclude that the court reasonably could have formed a firm belief or conviction about the truth of the Department's allegations. *See In re R.R.A.*, 687 S.W.3d at 276. We further conclude that when

considering all the evidence, the disputed evidence that the trial court could not have credited in favor of the findings is not so significant that the court could not have formed a firm belief or conviction that the findings were true. *See In re A.C.*, 560 S.W.3d at 631. We hold that legally and factually sufficient evidence supports the trial court's findings that Mother violated subsections (D) and (E).

## C. Best Interest Finding

In addition to proving a statutory predicate ground for termination, the Department must also prove by clear and convincing evidence that termination of the parent's rights is in the children's best interest. TEX. FAM. CODE § 161.001(b)(2). A "strong presumption" exists that keeping children with their parent serves the children's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). Courts also presume that "the prompt and permanent placement of the child in a safe environment" is in the child's best interest. TEX. FAM. CODE § 263.307(a).

This inquiry is "child-centered and focuses on the child's well-being, safety, and development." *In re J.W.*, 645 S.W.3d at 746 (quoting *In re A.C.*, 560 S.W.3d at 631). When conducting this inquiry, we consider several nonexclusive factors, including:

- The desires of the child;
- The child's emotional and physical needs now and in the future;
- The emotional and physical danger to the child now and in the future;

27

- The parenting abilities of the individuals seeking custody;

- The programs available to assist those individuals to promote the child's best interest;

- The plans for the child by those individuals or by the agency seeking custody;

- The stability of the home or proposed placement;

- The parent's acts or omissions that may indicate the existing parent-child relationship is improper; and

- Any excuse for the parent's acts or omissions.

*Id.* (citing *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)). We may also consider the factors set out in Family Code section 263.307, which the court should consider "in determining whether the child's parents are willing and able to provide the child with a safe environment." TEX. FAM. CODE § 263.307(b) (listing thirteen factors including child's age and physical and mental vulnerabilities, willingness of child's family to accept and complete counseling services, willingness of child's family "to effect positive environmental and personal changes within a reasonable period of time," and whether child's family demonstrates adequate parenting skills); *In re A.C.*, 560 S.W.3d at 631 n.29.

Even if the Department proves a predicate ground for termination, it must still prove that termination is in the child's best interest, although "the same evidence may be probative of both" inquiries. *In re A.C.*, 560 S.W.3d at 631–32. The factfinder may infer that past conduct endangering the child's well-being "may recur in the future if the child is returned to the parent." *In re D.M.*, 452 S.W.3d 462, 471

(Tex. App.—San Antonio 2014, no pet.). The Department is not required to prove all the *Holley* factors as a condition precedent to termination of a parent's rights. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002).

Fourteen-year-old Daniel and Mother had an emotionally fraught relationship. During visits and counseling sessions, Mother blamed Daniel for the existence of the case, and she accused him of being jealous of his younger siblings and their relationship with her. Mother's behavior caused Daniel emotional turmoil, and he requested that visits with Mother cease. He told both Guidry and Meier that he wanted to stay in his current foster placement and that he wanted Mother's parental rights to be terminated. He told Guidry that he was afraid of experiencing physical and mental abuse if he lived with Mother again.

Because Alex and Oscar were only six and four years old, respectively, at the time of trial, neither Guidry nor Meier discussed the implications of the termination proceeding with them or asked their desires. But Guidry and the boys' foster mother testified that Alex and Oscar had not asked to see Mother since visits with her ended months before trial.

The children are all physically healthy. Daniel has been diagnosed with ADHD and disruptive mood dysregulation, and he has a history of engaging in disruptive and aggressive behavior. He displayed a lot of anger when he was first removed from Mother's care, and he was discharged from multiple residential

treatment centers due to aggression. Although he and Mother participated in family counseling together, Mother behaved inappropriately during these sessions. This behavior of Mother's, which also occurred during family visits, upset Daniel, and he frequently left visits early and returned to the car crying.

Daniel moved into a foster placement, and he eventually stopped having visits with Mother. Both these developments led to positive improvements in Daniel's mood and behavior. He now enjoyed going to school, his grades had improved, and he had not had any recent behavioral issues while at school or any angry "blowouts." He made friends and was involved in athletics. Daniel "actually engaged in therapy," and his therapist believed he had made "tremendous progress." He continued to work on expressing himself and on his ability to talk through his emotions. Although he still took a mood stabilizer and medication relating to ADHD, his medication levels had decreased since he first entered foster care.

Alex had been diagnosed with ADHD and adjustment disorder with anxiety, and he also took medication and participated in therapy. Like Daniel, Alex also tended to display anger and aggressive behavior. Visits with Mother caused Alex great anxiety and disrupted his sleep to the point he was waking up around fifteen times per night and his foster parents had to sleep outside his bedroom door. Alex's sleep improved markedly after the visits were discontinued: he mostly slept through the night, his foster parents no longer had to sleep outside his door, and his levels of

30

sleep medication decreased. A Department permanency report completed shortly before trial stated that while Alex still had frequent outbursts, he was "learning more to self-calm using his coping mechanisms learned in skills," and he was "highly engaged in the [therapy] session and thoughtful in his responses."

Oscar did not have any medical concerns and did not take any medications. He did participate in weekly therapy to help him handle "oppositional behaviors," learn about following directions, learn problem-solving skills, practice asking for help, and "reduce defiance towards adults." At the time of his removal from Mother's care, Oscar was underweight and struggling with potty-training, but these concerns had resolved. Oscar was an active and "joyful little boy."

All the children had been in their foster placements for at least a year by the time of trial. Guidry, Meier, and the children's foster mothers all testified that the children were thriving in their placements: the children were happy and healthy, and their behavior had improved significantly. The witnesses believed that the stability of the placements had contributed to the children's improvements, particularly with respect to Alex, who thrived on routine. Both foster placements were adoptive placements. And although Daniel would not be placed with Alex and Oscar, the foster mothers testified that they were committed to ensuring that the children remained in frequent contact and remained part of each other's lives.

Daniel's foster mother wanted him "to grow up and be a bright young kid . . . a great kid to blend into society." She hoped he would "go and live his dreams to one day have a family and do all the great things that life has to offer him." Alex and Oscar's foster mother planned to "continue to just be a part of their lives." She was excited to be a "homeroom mom" for one—or both—of the boys in the upcoming school year. She wanted to "let them explore their identity and give them all the opportunities that they deserve as far as extracurricular activities, athletics, academics and just watch them grow and enjoy them."

Mother testified that she wanted to "be there [for the children] through their development." She did not want to miss out on their lives. Instead, she wanted to help them be happy, provide them with stability and structure, and raise them "to be successful young men in society."

In sum, the trial court heard evidence that Mother's violent conduct towards Daniel led to his removal from her care in August 2021, and her violent conduct towards Alex led to his and Oscar's removal more than two years later in January 2024. Mother did not demonstrate that she could maintain stable housing and employment throughout the case. Nor did she successfully complete individual counseling or engage in therapy related to her mental health issues. Mother's behavior could be volatile and abusive, and her conduct during counseling with Daniel and visits with all three boys led to conflict, anxiety, and emotional

32

disturbances for the children. The children's moods and behaviors improved when they were no longer having visits with Mother, they were all engaged in therapy and learning new coping skills, and they were all thriving in their foster placements, which were adoptive placements.

When considering the evidence in the light most favorable to the trial court's best interest finding, we conclude that the court reasonably could have formed a firm belief or conviction that termination of Mother's parental rights was in the children's best interest. *See In re C.E.*, 687 S.W.3d at 308. Further, when weighing the evidence in favor of the finding against any disputed evidence, we conclude that the disputed evidence that the court could not have credited in favor of its best interest finding is not so significant that it could not have formed a firm belief or conviction that the finding was true. *See In re A.C.*, 560 S.W.3d at 631. We therefore hold that legally and factually sufficient evidence supports the trial court's finding that termination of Mother's parental rights was in the children's best interest.

We overrule Mother's first and third appellate issues.

## Conclusion

We affirm the trial court's order modifying the January 2023 conservatorship order and terminating Mother's parental rights to Daniel, Alex, and Oscar.

David Gunn
Justice

Panel consists of Justices Gunn, Caughey, and Morgan.

Justice Caughey, concurring.